# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

Western  Division

| | |
|---|---|
| MARK W. BROWN, JR. | Case No. ___5:23-cv-405___ |
| | *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | Jury Trial: *(check one)* [✓] Yes [ ] No |
| **-v-** | |
| CITY OF DURHAM POLICE DEPARTMENT, PATRICE ANDREWS, POLICE CHIEF,  in her individual and official capacity, GEORGE ZEIPEKKIS, CAPTAIN,  in his individual and official capacity, and TYLER STEBBINS, OFFICER, in his individual and official capacity. | |
| *Defendant(s)* | |
| *(Write the full name of each defendant who is being sued.  If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I.      The Parties to This Complaint

#### A.      The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | MARK W. BROWN JR. |
| Street Address | 708 Van Thomas Drive |
| City and County | Raleigh   (Wake County) |
| State and Zip Code | NC 27615 |
| Telephone Number | |
| E-mail Address | |

#### B.      The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | City of Durham |
| Job or Title *(if known)* | |
| Street Address | 101 City Hall Plaza |
| City and County | Durham  Durham |
| State and Zip Code | NC  27701 |
| Telephone Number | (919) 560-1200 |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | Patrice V. Andrews |
| Job or Title *(if known)* | Police Chief and as individual |
| Street Address | 101 City Hall Plaza |
| City and County | Durham  Durham |
| State and Zip Code | NC  27701 |
| Telephone Number | (919) 560-4427 |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | George Zeipekkis |
| Job or Title *(if known)* | Captain and as individual |
| Street Address | 101 City Hall Plaza |
| City and County | Durham Durham |
| State and Zip Code | NC 27701 |
| Telephone Number | (919) 560-4427 |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | Tyler Stebbins |
| Job or Title *(if known)* | Officer and as individual |
| Street Address | 101 City Hall Plaza |
| City and County | Durham Durham |
| State and Zip Code | NC  27701 |
| Telephone Number | (919) 560-4427 |
| E-mail Address *(if known)* | |

### C.     Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | City of Durham Police Department |
| Street Address | 101 City Hall Plaza |
| City and County | Durham Durham |
| State and Zip Code | NC  27701 |
| Telephone Number | (919) 560-4427 |

## II.     Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑     Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑     Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐     Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑     Other federal law *(specify the federal law)*:

42 U.S.C. 1983 (equal protection and retaliation / first amendment)

☐     Relevant state law *(specify, if known)*:

wrongful discharge in violation of public policy

☐     Relevant city or county law *(specify, if known)*:

### III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐    Failure to hire me.

☑    Termination of my employment.

☐    Failure to promote me.

☐    Failure to accommodate my disability.

☐    Unequal terms and conditions of my employment.

☑    Retaliation.

☐    Other acts *(specify)*: _____

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

August 18, 2020 - March 24, 2022

C.    I believe that defendant(s) *(check one)*:

☐    is/are still committing these acts against me.

☑    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☑    race _____

☐    color _____

☑    gender/sex _____

☐    religion _____

☐    national origin _____

☐    age *(year of birth)* _____ *(only when asserting a claim of age discrimination.)*

☐    disability or perceived disability *(specify disability)*

_____

E.    The facts of my case are as follows.  Attach additional pages if needed.

See attached Exhibit A.

---

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.  Exhaustion of Federal Administrative Remedies

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

August 26, 2022 See Exhibit B (Charge and Right to Sue).

---

B.    The Equal Employment Opportunity Commission *(check one)*:

☐    has not issued a Notice of Right to Sue letter.

☐    issued a Notice of Right to Sue letter, which I received on *(date)*   04/27/2023                    .

*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.    Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☑    60 days or more have elapsed.

☐    less than 60 days have elapsed.

## V.  Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Reinstatement, back pay, attorney's fees, investigation of the allegations against me, and a chance to clear my name.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 07/25/2023

Signature of Plaintiff

Mark Wendell Brown Jr (Jul 25, 2023 14:52 EDT)

Printed Name of Plaintiff    Mark Wendell Brown Jr

### B. For Attorneys

Date of signing: 07/25/2023

Signature of Attorney    *Valerie L. Bateman*

Printed Name of Attorney    Valerie L. Bateman

Bar Number    13417

Name of Law Firm    New South Law Firm

Street Address    209 Lloyd St. Ste 350

State and Zip Code    Carrboro NC 27510

Telephone Number    (919) 810-3139

E-mail Address    valerie@newsouthlawfirm.com

**BROWN HAD A HISTORY OF GOOD PERFORMANCE
WITH THE CITY OF DURHAM POLICE DEPARTMENT**

1.    Mark Sgt. Brown was employed by the City of Durham from June 2004 to

March 2022.

2.    Prior to his becoming an officer with the Durham Police Department, Sgt.

Brown had served as a Military Police Officer in the Marine Corps.

3.    Between 1997 and 2004, Sgt. Brown worked as a correctional officer and

went to North Carolina Central University. Sgt. Brown earned his degree of

Bachelor of Arts for Psychology and Bachelorettes in sciences for Criminal

Justice.

4.    Sgt. Brown was hired initially as a police recruit on June 1, 2004.  Upon

completion of the Durham Police Academy on January 15, 2005,  Sgt. Brown

became a patrol officer for Durham Police Department.

5.    On January 1, 2009, Sgt. Brown was selected as a narcotics and gang

investigator.

6.    On April 27, 2012,  Brown was promoted to Police Corporal.

7.    On May 11, 2021, Brown was promoted to the rank of Sergeant.

8.    His performance evaluations have always been excellent.

| Year | Details (describe) |
|---|---|
| 2010/8 | Exceeded Expectation |
| 2011/8 | Exceeded Expectation |
| 2012/8 | Exceeded Expectation |
| 2013/8 | Exceeded Expectation |
| 2014/8 | Exceeded Expectation |

1

| 2015/8 | Exceeded Expectation |
|--------|----------------------|
| 2016/8 | Exceeded Expectation |
| 2017/8 | Exceeded Expectation |
| 2018/8 | Exceeded Expectation |
| 2019/8 | Exceeded Expectation |

## MARCH 23, 2022 INCIDENT
## WHICH LED TO BROWN'S CONSTRUCTIVE DISCHARGE

9.  The particular event which precipitated Sgt. Brown's constructive discharge occurred on March 23, 2022, when Sgt. Brown was involved in the arrest of a suspect with other officers.

10. The other officers involved in the arrest were not threatened with arrest and termination and received no punishment even though one of them raised his arm and almost struck the arrestee but was stopped by Brown.

11. The arrestee had a history of violence which the City knew or should have known. After the use of force incident in question, the arrestee ultimately killed a person he attacked.

12. The incident began at the Durham bus station where Officer Gregory Andrea was a retired police officer and was working security at the bus station.

13. Brown responded to a call for back-up at the bus station.

14. Upon arriving on scene at the bus station, Officer Andrea informed Sgt. Brown that Abdullah Burnett had beaten up a bus driver.

15. Officer Andrea then informed Sgt. Brown that Burnett was known to assault police officers.

16.  Officer Andrea and Officer Richard Jiminez had already handcuffed Burnett

2

at the bus station.

17. Officer Jimenez stayed at the bus station after Burnett's removal from the premises to provide a Police presence at the bus station and Sgt Brown and Officer Andrea transported Burnett to the magistrate's office.

18. Despite being handcuffed, the arrestee Burnett was belligerent and continued to yell and refused to follow orders given to him.

19. Once at the jail, arrestee Burnett continued to yell and was belligerent.

20. Brown was wearing a body camera which recorded the events.

21. Officer Andrea was told by the magistrate to take Burnett to a holding cell because Burnette was continuing to yell and disrupt the magistrate's proceedings.

22. Burnette refused orders to calm down and sit down in a chair.

23. Sgt. Brown knew Burnette to be assaultive and understood that if he did not gain control of Burnette, another prisoner and/or Officer could be injured in the ongoing resistance.

24. Sgt. Brown then asked Officer Andrea if the magistrate told him to take Burnette to the holding cell. Officer Andrea confirmed that the magistrate commanded that Burnette be taken to a holding cell.

25. Sgt. Brown knew that if he were to place Burnette in a chair Burnette's power to resist would be lessened because he wouldn't have to deal with his momentum and height during a struggle. After Sgt. Brown put Burnette in a chair Burnett used his legs to pull Sgt. Brown's legs under the chair in which

3

Burnette was seated.

26. Sgt. Brown knew that if his legs were pulled under the chair, he would lose his footing and fall backwards.

27. Officer Andrea witnessed this and balled up his fist and prepared to strike Burnett.

28. Sgt. Brown told Officer Andrea not to hit Burnett.

29. Sgt. Brown then put his weight on top of Burnett and attempted to grab the top of Burnett's body.

30. Burnett attempted to bite Sgt. Brown's arm several times while wrestling.

31. Burnette was biting with his incisors and Sgt. Brown was able to pull his arm back every time he felt him bite.

32. Sgt. Brown was able to pry his legs from Burnett's grasp.

33. Sgt. Brown then put Burnett in a head lock which is not a choke hold and began to drag him toward a holding cell.

34. Burnett resisted and was combative during the duration of his being moved to a holding cell. Burnette pitched and bucked his body while he was being pulled into a holding cell.

35. Burnette's resistance was so great that two additional Officers (who had prisoners) grabbed Burnett's legs as Sgt. Brown was dragging Burnett into a holding cell (leaving their prisoners unsupervised).

36. Not only was Sgt. Brown trying to move Burnette but the additional Officers picking up Burnetts legs increased the weight Sgt. Brown was dragging. Sgt.

4

Brown not only had to pull Burnette now but ensure his head was not

dropped and that Burnette was not injured.

37.    Burnett was kicking at the officers' faces during the ordeal. Both officers were

holding Burnette's ankles, not his legs. Sgt. Brown maintained his path to

the holding cell. One of these officers was Officer Tyler Stebbins, who

subsequently reported to Capt. George Zeipekkis that Sgt. Brown used a

chokehold.

38.    Neither of the Officers reported a use of force at the magistrate's office which

would have been normal protocol.

39.    Neither Officer advised Sgt. Brown they believed a use of force had taken

place.

40.    Once in the holding cell, Sgt. Brown released Burnett and uncuffed him.

41.    Burnett was locked inside the holding cell.

42.    After everyone caught their breath, Sgt. Brown was told by the magistrate to

retrieve Burnett from the holding cell so he could be processed.

43.    Sgt. Brown retrieved Burnett from the holding cell. Burnett never

complained to Sgt. Brown at any time about being hurt or complained in any

way. Burnett complied with directives and was not touched again between

his removal from the cell and his presentation to the magistrate.

44.    Sometime after the incident involving Burnette, Officer Stebbins made an

allegation that Sgt. Brown engaged in an excessive use of force against

Burnette.

45. Excessive force occurs when an officer uses more force than is objectively reasonable in the situation.

46. Whether a use of force was objectively reasonable requires a review of the facts, including whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest.

47. Specifically, Stebbins alleged that Brown used a chokehold against Burnette.

48. Stebbins made the report to Sgt. Leeder who forwarded the report to Capt. Zeipekiss.

49. Sgt. Brown did not use a chokehold on Burnette. Brown's body camera recorded the events.

50. Even if Sgt. Brown had used a chokehold technique it would have been appropriate with Burnett because he actively resisting being taken toa cell and because he was known to be dangerous and assaultive to the point of death.

51. A chokehold is authorized when deadly force is reasonably necessary, as documented in General Order 4008-Use of Force.

52. Sgt. Brown knew Burnett's name prior to March 23, 2023, and recalled him being the cause of Officer Beck breaking his leg.

53. In addition, Sgt Brown knew that on another occasion Burnett had beaten Officer Robert Turner and after beating Officer Turner, Burnett then also body slammed Officer Turner.

54. Since Sgt. Brown's departure from the Durham Police Department, Burnett

6

has broken officer's nose. Burnette assaulted another civilian who was hospitalized and died from injuries weeks later.

55. Nonetheless, upon information and belief, prior to reviewing the body camera footage, on March 23, 2022, the day of the alleged excessive use of force, Sgt. Brown was informed he was suspended and that he was being investigated for an excessive use of force.

56. When Sgt. Brown was called to internal investigations he spoke with Capt.Pennica. Capt. Penica told Sgt. Brown that he was administrative leave with pay for a use of force.

57. Sgt. Brown told Sgt. Pennica that he had his body camera uploading and that he had not had a use of force. Sgt. Brown then proceeded to tell Capt. Pennica about the use of force events that had transpired.

58. Capt. Pennica stopped Sgt. Brown and told him not to speak anymore. Sgt. Brown then told Pennica that Burnette had bit his arm during the ordeal.

59. After this exchange with Pennica who indicated that he did not want to hear the facts from Brown, Brown became concerned that the incident would not be fairly investigated.

60. On March 24, 2022, the date after the incident, Sgt. Brown was contacted by several Officers (Retired Officer Carl Green, Retired Officer Charles Sole), including Captain Tammy Restrepo, and was informed that Chief Andrews intended to terminate him.

61. Sgt. Brown called Assistant Chief Mark Clancey and told Assistant Chief

Clancey he would retire immediately if he were given the opportunity, rather than resign or be fired.

62. Assistant Chief Clancey told. Sgt. Brown he would call the appropriate person and see what the response was.

63. Capt. Clancey called Sgt. Brown back and told him that he, Assistant Cheif Clancey, had been told to stay out of the matter involving Sgt. Brown.

64. Brown decided he would then give a two-week notice and resign his employment, intending to retire, being confident that if the Chief wanted to terminate him, she would find grounds to do so.

65. He sent an email at 2:05pm on March 24, 2022, with his two-week notice of his resignation for April 7, 2022, to Chief Andrews, Captain Zeipekiss, and Lt. English at 2:05pm.

66. Sgt. Brown thought that everything would calm down and he would be able to talk to the right person to de-escalate the situation.

67. Capt Restreppo then called Brown later and told him that Chief Andrews was refusing to accept his two-week resignation and that he had learned that she might possibly have him charged with assault.

68. Sgt. Brown knew that Capt. Restrepo was the liaison between the Durham City Human Resources and Durham Police Department.

69. Sgt. Brown knew that Capt Restrepo was in a position to know with good authority the status of Sgt. Brown's employment and whether any actual investigation was being done into the use of force alleged to have occurred the

8

previous day on March 23, 2023.

70. This threat of a criminal charge was well beyond the scope of anything that Sgt. Brown had seen done or threatened to be done in the context of allegations of excessive use of force allegations made against other employees alleged to have been involved in improper uses of force.

71. Sgt. Brown then submitted another letter of resignation immediately for March 24, 2022, at 1430 hours, which was approximately thirty minutes from entering his first resignation.

72. Sgt. Brown was later informed that Burnette never lodged a complaint.

73. Sgt.Brown was informed that investigators attempted to speak to Burnette about the incident, but investigators were unable to communicate with him.

74. At the time the threat of immediate termination without an investigation was being made, Sgt. Brown feared that if he was terminated, he might be arrested and lose his retirement.

75. Based on the threats that he would be arrested in addition to be investigated for an alleged excessive use of force, Sgt. Brown was forced by the City and the officers above him in his chain of command to resign .

76. This forced resignation denied him the ability to retire in retaliation for his opposing improper practices by Chief Patrice Andrews and other  violations of federal and state laws, rules, and regulations, substantial and specific dangers to the public health and safety, and gross abuses of authority.

**REPORT OF EXCESSIVE USE OF FORCE MADE BY AND PROCESSED THROUGH OFFICERS WHO WISHED TO**

9

## RETALIATE AGAINST HIM FOR OPPOSING THEIR PAST IMPROPER CONDUCT

77. In June 2020, Officer Stebbins pointed weapons at children playing.[1][2]

78. After this incident, Sgt. Brown had informed the officers under his command to notify him immediately if Stebbins went on any call like the one in which he pointed the gun when he worked with their District. Brown's remarks were not just a matter of work place concern, they were a matter of public concern because the careless pointing of a weapon at a child was matter of bad judgment by a law enforcement officer and affected issues of public safety.

79. Stebbins learned that Sgt. Brown had said this and held a grudge against him.

80. Stebbins' allegation that Sgt. Brown used a chokehold was in retaliation for Sgt. Brown's remarks opposing Stebbins' actions which endangered the life of a child. and had it been properly investigated, the falsity of his allegation would have been revealed.

81. Stebbins' made his allegation against Brown on March 23, 2022 to Capt. Zeipekiss also harbored a grudge against Sgt. Brown because of complaints Sgt. Brown had made during the early pandemic about workplace safety and retaliation by Capt Zeipekkis related to Sgt. Brown's reporting of workplace safety issues. The control of the pandemic and the exposure of front line

---

[1] https://indyweek.com/news/durham/a-year-after-police-pointed-guns-at-kids-playing-at-a- durham-apartment-complex-change-officer-remorse-did-not-follow/

workers such as police officers was not just a matter of workplace safety, it was a matter of public safety and control of the pandemic.

82. Brown knew that if an officer's temperature exceeded 100.4 degrees they could not work and would have to seek medical advice before being allowed to come back to work.

83. He also knew that the temperature for someone with hypothermia was 96.08, but that the device being used was consistently measuring officers' temperatures below 96.08 even while they were wearing bullet proof vest, making it obvious that the device was not accurate.

84. Sgt. Brown reported to Lt. H. Burwell and Capt. Zeipekkis that the device had not made accurate or constant measurements since the station began using it and that they had no accompanying instructions that could be read.

85. The only instructions for the thermometers were written in some unknown language with no way to interpret it. In addition, the officers were not trained to use the device.

86. Sgt. Brown pointed out that the officers were reliant on the device to maintain health and to avoid the spread of COVID-19, which again was a matter of public concern. He further stated that he was not attempting to make any waves but that he thought that more attention needed to be given to the devices.

87. Finally, Sgt. Brown noted that the station currently had one officer on a mandatory COVID quarantine and that they had lost another officer on April

27, 2020 after he became violently ill.

88. Lt Burwell and Capt Zepeikiss were aware of the faulty thermometers but told the officers to ignore them.

89. After Sgt. Brown exposed the dangerous work conditions resulting from an unreliable thermometer, Sgt. Brown was retaliated against by being given a coaching and counseling. Lt .Burwell sent an email to Sgt. Brown and his co-workers instructing them that they were required to conduct foot patrols (as a squad) together in a certain area which was intended to to expose them needlessly to the virus.

90. The specific area in which they were directed to jointly conduct foot patrols had been a hot spot in District One for years. In fact, prior to Lt. Burwell's directive, the officers in district one had conducted 176 individually directed patrols were conducted at or around the 800 block of N. Briggs Avenue.

91. When Sgt. Brown pointed out the risk of losing his entire squad if they all came down with the virus, Lt. Burwell told him he was being insubordinate for questioning the order which Burwell stated was lawful, clear and decisive.

92. In addition, Sgt. Brown was told he could no longer e-mail anyone at the Durham Police Department without first sending the email through Sgt. Van Dewater.

93. Sgt. Brown then complained about Lt. Burwell's retaliation and his creating a hostile and harassing work environment based on Sgt. Brown's raising the safety issue about the faulty thermometers which took place between April

12

29, 2020, and May 4, 2020.

94. On July 29, 2020, Lt. Tracey Bobbitt in Internal Affairs at Durham Police Department, informed Sgt. Brown that he was investigating Sgt. Brown's harassment and retaliation complaint.

95. The internal investigation failed to find that Sgt. Brown had been retaliated against for raising a matter of public concern.

96. Subsequently, Capt. Brown was also retaliated against by being denied positions in CID for which he had applied prior to prior to the movement list was emailed to all users.

97. On August 18, 2020, Sgt Brown also notified Lt. Bobbitt that he was being retaliated against for raising issues of public concern because his supervisor Sgt. Van Dewater was forced to give Sgt. Brown a lesser annual evaluation score by Captain Zeipekiss. Capt. Zeipekiss sent an e-mail to Sgt. Brown's supervisor, Sgt Van Dewater stating that Sgt. Brown was not entitled to an exemplary rating because "exemplary did not reflect the quality of his work or his disciple [sic] for insubordination towards his command staff."

98. Capt. Zeipekkis characterized a "Coaching and Counseling" memorandum as disciplinary action even though the Human Resources Manual 322-2 and General Order 2001 R-6 providing that the counseling session was not "disciplinary action."

99. Sgt. Brown had received the coaching from Lt. Burwell for events which took place between April 29, 2020, and May 4, 2020, relating to Sgt. Brown's

13

complaints about workplace safety issues and inaccurate temperature readings at the beginning of the pandemic.

100. When Sgt. Brown asked for confirmation on May 4, 2020, that patrols were being required in a certain area, Lt. Burwell characterized Brown's request for confirmation as "insubordinate" and issued him the counseling.

101. Capt. Zepeikiss had previously been disciplined for poor judgment.[2]

102. After Sgt Brown's report of workplace safety concerns, Capt Zepeikiss was moved from Sgt. Brown's District 1.

103. After he moved from District One, he was placed as a Captain in Special Operation Division. While he was in SOD, he received another hostile work environment complaint by Sergeant Tom McMaster and was moved back to District One where Sgt. Brown was a Sergeant.

104. The retaliatory allegations by Stebbins that Sgt Brown used a chokehold on Abdullah Burnette were pushed to Capt Zepeikiss because he had returned to Sgt Brown's chain of command as of March 23, 2023.

105. Stebbins was aware that Capt Zepeikiss had a grudge against Sgt. Brown due to being named in previous EEOC charges filed by Sgt. Brown.

106. He also knew that Capt Zeipekkis had a grudge against Brown for filing his grievance about being retaliated against for complaining about the defective thermometers being used to measure officers' temperatures, but

---

[2] https://www.wral.com/durham-police-officers-disciplined-for-using-parts-of-seized- weapons/13593998/

14

doing nothing about it.

107. The involvement of Capt. Zepeikiss in the alleged "investigation" of the use of force was prima facie evidence of retaliation against Sgt. Brown for naming him in the previous EEOC charge.

108. Sgt. Brown also made past EEOC complaints about a supervisor that had groped other officers, including Sgt. Brown.

109. Sgt. Brown thought the supervisor should be charged. Not only was he groping other employees, but he was armed with a handgun provided by Durham Police Department.

110. One of his victims, Officer Chris Wisnieski, made a complaint about a groping incident that was witnessed by other Officers. The supervisor was given days off but not charged or demoted.

111. Sgt. Brown informed Durham Police Department that the same supervisor had groped him also. Sgt. Brown then found additional Officers the supervisor had groped and provided their names as proof of his allegations and those of Officer Wisnewski. None of the officers Sgt. Brown named were questioned and Sgt. Brown was sent a cease and desist order from Durham City.

112. After Capt. Zepeikiss received Stebbins' allegations against Sgt Brown, he reported them to Chief Patrice Andrews, as his supervisor.

113. Sgt. Brown knew that Chief Andrews also held a grudge against him because they had a history prior to her becoming Chief in 2022 which went back to

15

2004.

114.    In 2004, while Sgt Brown was attending the police academy, Sgt. J. Morris

told recruit officers the typical things that Officers get fired for is booze and

women.  Sgt. Morris then told recruits that he had an affair with Patrice

Vickers (later Patrice Andrews) and it ruined his marriage.

115.    On April 11, 2011, Officer Brown was on a High Enforcement Abatement

Team.  The team targeted violent offenders.

116.    Officer Brown's Sergeant (Sergeant Rhodes) was arrested for sexual assault

of a civilian he had conducted a vehicle stop on.[3]

117.    Shortly before or after the arrest of Sgt Rhodes,  one of Officer Brown's team

members had sent sexually suggestive pictures to a confidential informant

that was working off drug charges by purchasing drugs for Durham Police

Department.  That Officer resigned.

118.    In May 2011, Sgt. Vickers (now Chief Andrews) came to Officer Brown and

told him he would have to be strong and pull his team together during this

time.

119.    Officer Brown was aware that Vickers (now Andrews) was in an intimate

relationship with two of his other co-workers who were also on his team,

Officer Nicholas McGaughey and Officer Chris Andrews who was on were on

the same HEAT team as Sgt. Brown and who were also roommates.

---

[3] https://www.wral.com/story/durham-police-sergeant-charged-with-sexual-assault/9412643/

120. The relationships caused Chris Andrews and Nicholas McGaughey not to be able to work well with one another on the team.

121. When Patrice Vickers told Officer Brown to be strong and pull the team together, Officer Brown told Vickers that the only problem with the team was her and her relationship with both Officers Chris Andrews and Nicholas McGaughey. Patrice Vickers became infuriated and stormed away from Officer Brown.

122. Officer Patrice Vickers (later Andrews) was oblivious to the negative effect on morale of having personal relationships with her co-workers while working as a police officer with the City of Durham. Subsequent relationships demonstrated the same pattern of behavior and the same negative effect on morale.

123. Sgt. Brown knew that he had never had a good relationship with the police chief during his entire employment with the Durham Police Department and that Chief Andrews held a grudge against him, even though much time had passed, and would not be inclined to treat him fairly.

124. Brown also believed that if he were fired, his prospects for other employer in law enforcement would be limited.

125. Sgt. Brown was constructively discharged as a result of the threats of arrest and immediate termination.

126. As a result of his constructive discharge, Sgt. Brown had to buy military time and take money from his 401k account. Sgt. Brown was denied his

17

supplemental retirement, medical insurance, standing in the law enforcement community, official retirement and LEOSO rights.

127. Sgt. Brown had no plans on retiring in the near future.

128. Brown was aware that he was being treated differently and excessively compared to other officers accused of misconduct.

129. For example, Sgt. Willet (W/M/50s/no EEOC complaints) was embezzling money and stealing equipment from Durham Police Department and was allowed to retire upon request.

130. Sgt. Taylor (W/M/late 40s/no complaints about issues of public concern or discrimination) was stealing equipment from Durham Police Department and was allowed to retire.

131. Officer Cook (B/M/30s/no complaints about issues of public concern or discrimination) was extorting sex from domestic violence victims in return for pressing charges against their partners and was not threatened with termination.

132. Officer Hustice (W/M/20s/no complaints about issues of public concern or discrimination) was involved in a similar incident. Officer Hustice told an individual he was going to choke him. Officer Hustice then choked the individual. Officer Hustice was not even placed on administrative leave. Officer Hustice was punished by giving him eight hours off.

133. Upon information and belief, employees are rarely if ever disciplinared or terminated by the City for excessive use of force and justifiable uses of force

18

are a routine part of policing when dealing with combative individuals.

134. Police Department policy provides for thorough investigations and formal oversight over disciplinary action by Human Resources but Brown knew that if Andrews wanted him terminated and criminally charged with assault, she would likely be able to make that happen and Human Resources would go along with it, as would the legal department.

135. Brown was afraid after he was told that Andrews was considering criminal charges that he would be railroaded and terminated and unable to work in law enforcement again.

136. Brown did not know how the Police Department could have conducted a thorough investigation by the time he was threatened with criminal charges.

137. Brown was worried about being treated fairly because Sgt. Pennica in charge of the internal affairs investigation would not listen to his side of the incident and told him to stop talking and did not take a statement from him.

138. Brown was not aware of any other employees who had been threatened with being charged with assault as a result of a use of force, even officers who had engaged in egregious uses of force far in excess of the force he sued to subdue Burnett.

139. Brown was treated differently from other officers because he complained about issues of public concern and opposed inappropriate law enforcement practices during his employment. The fact that the complaints did not take place close in time to his termination did not mean that the individuals

19

involved in his constructive discharge were not motivated by a desire to retaliate against him. It just means that the first opportunity they got to do so was the incident on March 23, 2022.

140. Chief Andrews made policy decisions and personnel decisions for the Police Department and these decisions were not second-guessed or reviewed by any other City officials and she was allowed to run the Police Department without any oversight. She was aware that both Capt. Zeipekkis and Officer Stebbins were making retaliatory allegations against me that were not true or were at least questionable and she did nothing about this because she too wanted to get rid of me for maybe the same or maybe different reasons, but none of the reasons were legitimate or lawful.

Exhibit B to Complaint Mark W. Brown Jr. V. City of Durham, et al
EEOC Charge and Notice of Right to Sue
Page1

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 433-2022-02817 |

and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Year of Birth |
|---|---|---|
| **Mark W. Brown** | **919-943-9464** | **1974** |

| Street Address | City, State and ZIP Code |
|---|---|
| **708 Van Thomas Drive** | **Raleigh, NC 27615** |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **City of Durham** | **15+** | **919-560-4214** |

| Street Address | City, State and ZIP Code |
|---|---|
| **101 City Hall Plaza** | **Durham, NC 27701** |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN

☒ RETALIATION ☒ AGE ☒ DISABILITY ☐ GENETIC INFORMATION

☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **August 2021** Latest **February 2021**

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.      I am a White male over the age of 40. I was employed by the above-named employer since 2004.

II.     On March 23, 2022, I was involved in an arrest of a suspect with other officers. An hour later, I was called by Internal Affairs and put on non-paid administrative leave. Minutes after signing the paid administrative acknowledgement I was put on unpaid administrative leave.

III.    The day after being placed on unpaid administrative leave I was called and told by retired Police Officers and others that Chief Andrews was in the process of terminating my employment I was told that I was going to be fired and so I thought I had no choice but to resign on date.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Aug 26, 2022          *mark Brown*<br>mark Brown (Aug 26, 2022 13:13 EDT) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | |

Exhibit B to Complaint Mark W. Brown Jr. V. City of Durham, et al
EEOC Charge and Notice of Right to Sue
Page2

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | FEPA | |
| | x    EEOC | **433-2022-02817** |
| State or local Agency, if any | | and EEOC |

IV.  I was the only officer involved in the incident that was alleged to have used excessive force.  Three other officers were involved.   No other Officer involved in the incident was placed on either paid or unpaid administrative leave.  I was threatened with termination even though I stopped another Officer from physically striking the arrestee in the face.  My resignation was caused by the hostile work environment created by police chief Patrice Andrews who treated me differently because I am an older, white male who is a disabled veteran and made a previous claim of discrimination.

V.  I also believe I was discriminated against me of my age, over 40, in violation of the Age Discrimination in Employment Act, as amended (ADEA); because of my disability, in violation of the Americans with Disabilities Act (ADA); and because of my sex, Male, and race (White) in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII) and in retaliation for my opposing illegal discrimination.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| Aug 26, 2022          _mark Brown_<br>mark Brown (Aug 26, 2022 13:13 EDT)<br>_____Date_____     _Charging Party Signature_ | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

Exhibit B to Complaint Mark W. Brown Jr. V. City of Durham, et al
EEOC Charge and Notice of Right to Sue
Page3



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Raleigh Area Office**
434 Fayetteville Street, Suite 700
Raleigh, NC 27601
(984) 275-4800
Website: www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: April 26, 2023

**To:** Mark W. Brown
708 Van Thomas Dr.
Raleigh, NC 27615
Charge No: 433-2022-02817

EEOC Representative and email:    Arely Tochez
Investigator Bilingual
arely.tochez@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 433-2022-02817.

On behalf of the Commission,

Johnnie M.
Barrett, Area
Director

Digitally signed by
Johnnie M. Barrett, Area
Director
Date: 2023.04.26 19:26:28
-04'00'

Johnnie Barrett
Area Director